# BEFORE THE UNITED STATES
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re: Cymbalta Products Liability Litigation

MDL No. 2662

Oral Argument Requested

**RESPONSE TO PLAINTIFFS' SECOND MOTION PURSUANT TO 28 U.S.C. § 1407 TO TRANSFER RELATED ACTIONS FOR COORDINATED PRETRIAL PROCEEDINGS**

Eight months ago, the Panel denied Plaintiffs' motion to centralize the Cymbalta discontinuation actions. Since that decision, there have been no significant changed circumstances that warrant a reconsideration of that ruling. To the contrary, the developments over the last eight months — including completion of the first swath of trials and extensive additional common discovery — demonstrate the wisdom of the Panel's decision. The Panel should reaffirm its prior decision and allow the existing cases — each presenting unique facts and circumstances based on the individual plaintiffs and their medical histories — to move forward expeditiously toward ultimate resolution.

Rather than seeking to achieve coordination and efficiency, the real motivation for Plaintiffs' second petition seems to be found buried in their brief: "the attorneys litigating these cases have thousands of cases in the pipeline, which, absent an MDL, would need to be filed prior to the expiration of various statutes of limitations." Pls' Second Petition at 7. Plaintiffs hope to warehouse these cases in a single court, avoid litigation on the merits, and leverage sheer numbers as a means of forcing Lilly to settle these lawsuits. This tactic is fundamentally inconsistent with the purpose of 28 U.S.C. § 1407, which is intended to allow the smooth coordination of existing actions, not to provide a mechanism to allow case aggregation that avoids the basic requirements of bringing a lawsuit.

## I. BACKGROUND

### A. Overview of Cymbalta and Discontinuation Warnings

As set forth in Lilly's response to Plaintiffs' first motion to centralize the Cymbalta discontinuation cases, Cymbalta is an FDA-approved prescription medicine manufactured by Lilly to treat severe depression, anxiety, and pain disorders. From the moment that FDA first approved Cymbalta in 2004, Cymbalta's FDA-approved label has included a detailed, three-paragraph warning on the risk of discontinuation symptoms — the symptoms Plaintiffs allege were inadequately warned of in the label — that has remained largely unchanged in the ensuing decade. The label by 2008 read as follows:

> 5 WARNINGS AND PRECAUTIONS
>
> . . . .
>
> 5.6 Discontinuation of Treatment with Cymbalta
>
> Discontinuation symptoms have been systematically evaluated in patients taking duloxetine. Following abrupt or tapered discontinuation in placebo-controlled clinical trials, the following symptoms occurred at a rate greater than or equal to 1% and at a significantly higher rate in duloxetine-treated patients compared to those discontinuing from placebo: dizziness, nausea, headache, fatigue, paresthesia, vomiting, irritability, nightmares, insomnia, diarrhea, anxiety, hyperhidrosis and vertigo.
>
> During marketing of other SSRIs and SNRIs (serotonin and norepinephrine reuptake inhibitors), there have been spontaneous reports of adverse events occurring upon discontinuation of these drugs, particularly when abrupt, including the following: dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g., paresthesias such as electric shock sensations), anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures. Although these events are generally self-limiting, some have been reported to be severe.
>
> Patients should be monitored for these symptoms when discontinuing treatment with Cymbalta. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the

> dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the physician may continue decreasing the dose but at a more gradual rate [see Dosage and Administration (2.4)].

Cymbalta Physician Packet Insert (June 2008). This warning lists more than a dozen symptoms that were observed in Cymbalta's clinical trials "at a significantly higher rate in [Cymbalta]-treated patients compared to those discontinuing from placebo" and which occurred about the minimal threshold of "greater than or equal to 1%." The label also warns of the possibility of "severe" side effects upon the discontinuation of Cymbalta, and it explicitly instructs physicians to taper patients off Cymbalta and to closely monitor patients for those symptoms when discontinuing the medicine.[1]

### B. First Group of Cymbalta Discontinuation Cases (2012-2013)

The first Cymbalta action alleging discontinuation side effects against Lilly was a putative class action filed in October 2012, *Saavedra v. Eli Lilly and Company*, No. 12-cv-9366 (C.D. Cal.). On December 18, 2014, shortly after the Panel's original decision, the Judge Wilson

---

[1] Even apart from the warning on Cymbalta's label, the risk of such discontinuation symptoms associated with all antidepressants, including Cymbalta, is commonly understood in the medical community. The American Psychiatry Association's Practice Guidelines for the Treatment of Patients With Major Depressive Disorder, for instance, cautions that "abrupt discontinuation of SNRIs [Serotonin-Norepinephrine Reuptake Inhibitors] should be avoided wherever possible," because discontinuation symptoms may occur. *See* http://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/mdd.pdf (last visited August 14, 2015), at 20, 40. Indeed, such information is widely available on virtually all medical information web resources. *See, e.g.,* WebMD, Antidepressant Withdrawal, *available at* http://www.webmd.com/depression/guide/withdrawal-from-antidepressants ("Antidepressant withdrawal, more correctly called antidepressant discontinuation syndrome, refers to a unique set of symptoms that can develop after you stop taking an antidepressant.") (last visited August 14, 2015); Mayo Clinic (Daniel K. Hall-Flavin, M.D.), Antidepressant Withdrawal FAQ, *available at* http://www.mayoclinic.org/diseases-conditions/depression/expert-answers/antidepressant-withdrawal/faq-20058133 ("Antidepressant withdrawal is possible if you abruptly stop taking an antidepressant, particularly if you've been taking it longer than six weeks. Symptoms of antidepressant withdrawal are sometimes called antidepressant discontinuation syndrome") (last visited August 14, 2015).

denied Plaintiffs' motion for class certification. On July 21, 2015, Judge Wilson denied Plaintiffs' second motion for class certification. Lead plaintiff Jennifer Saavedra has since abandoned her role as lead putative class plaintiff, filing an amended personal injury-only complaint, leaving only three remaining representative plaintiffs.

Beginning in the Spring of 2013, Plaintiffs filed seven additional actions filed between March and June 2013. Those cases are now largely complete. Lilly obtained summary judgment in two of the initial cases. *Carnes v. Eli Lilly and Co.*, No. 0:13-591-CMC, 2013 WL 6622915, at \*7 (D.S.C. Dec. 16, 2013) (granting summary judgment because plaintiffs' physician understood Cymbalta's discontinuation risks); *McDowell v. Eli Lilly & Co.*, 58 F. Supp. 3d 391 (S.D.N.Y. 2014) (granting summary judgment on both proximate cause and the legal adequacy of Cymbalta's warnings). In holding that the Cymbalta label was adequate as a matter of law shortly before the Panel's initial consideration of this matter, Judge Sweet in *McDowell* criticized the essential gimmick of the plaintiff's challenge to Cymbalta's FDA approved labeling: "The warning should also be evaluated as a whole and not through the nitpicking prism of an interested legal advocate after the fact." *Id.* at 403. In the months following, Judge Sweet has *twice* reaffirmed his ruling, rejecting Plaintiff's multiple motions for reconsideration, and the time for appeal has lapsed. *See McDowell v. Eli Lilly and Co.*, 2015 WL 845720 (Feb. 26, 2015); *McDowell v. Eli Lilly and Co.*, 2015 WL 4240736 (July 13, 2015).

Two of the original seven Plaintiffs voluntarily dismissed their cases against Lilly: *Carter* in the Central District of California and *Lister* in the Eastern District of Pennsylvania.[2] And the cases for the remaining three Plaintiffs have either been concluded or are at the final stage: *Herrera* (C.D. Cal.) proceeded to trial on August 4, 2015, with Lilly

---

[2] *Lister* was refiled in the Eastern District of Pennsylvania on July 30, 2015.

obtaining a full defense verdict on August 7, 2015. *Hexum* (C.D. Cal.) proceeded to trial on August 11, 2015, and Judge Wilson directed a verdict in Lilly's favor on August 13, 2015. The last of the initial cases, *Seagroves* (D. Ariz.), is in expert discovery with dispositive motions due in October 2015.

### C. The Second Wave of Cases and Plaintiff's First Petition

In advance of Plaintiffs' first petition to this Panel, the same counsel who had filed the first set of Cymbalta cases filed a burst of new actions against Lilly between August 8 and August 13 — a total of 21 new cases. Without bothering to serve any of these lawsuits on Lilly, Plaintiffs' Counsel immediately filed their centralization motion. During the pendency of the petition, Plaintiffs filed an additional 19 new cases and noticed them as related actions.

In its initial decision in December 2014, Panel offered three reasons for declining to centralize this litigation: (1) the cases at issue were in different procedural postures; (2) most of the common discovery in the litigation was complete; and (3) there were relatively few law firms involved. *See In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, 65 F. Supp. 3d 1393, 1393-94 (J.P.M.L. 2014). In the interim, nothing has occurred that merits revisiting the Panel's sound decision.

After the Panel denied the first motion and service deadlines came due, Lilly was able to begin the initial discovery process through the collection of medical records. The results of this initial discovery demonstrates exactly why the creation of a centralized proceeding that would likely shield such discovery from the vast majority of the cases is unwise. Even in the limited sample cases filed in connection with Plaintiffs' original petition, a growing number are already dropping away:

- *Whitworth* (E.D.N.C.): voluntarily dismissed

5

- *Forbes* (D. Mass.): voluntarily dismissed

- Lemley (N.D. Ala.): voluntarily dismissed

- *Gollin* (S.D. Fla.): set to be dismissed following Lilly's frivolous litigation letter

- *Caporale* (C.D. Cal.): Lilly anticipates the case will be dismissed following Lilly's frivolous litigation letter

- *Valentino* (M.D. Fla.): Lilly anticipates the case will be dismissed following Lilly's frivolous litigation letter

- *Mayes* (N.D. Ohio): dismissed with prejudice by the Court after the Plaintiff failed to appear for multiple mandatory Court hearings and failed to comply with his discovery obligations, forcing his counsel to move to withdraw as well. *See Mayes v. Eli Lilly and Company*, D.E. 46, 4:14-cv-01759-BYP (N. D. Ohio June 30, 2015) ("Despite the Court's warning that Plaintiff's absence may lead to the impositions of sanctions (ECF No. 43), Plaintiff Gregory Mayes failed to attend the hearing. This was not Plaintiff's first instance of refusing to participate in the prosecution of his case, as Plaintiff had also failed to attend the April 29, 2015 Case Management Conference despite instructions to do so. ECF No. 29 at 1.") (attached as Exhibit 1).

In addition to the cases listed above, Lilly continues to review medical records as they come in and expects similar letters in the weeks to come.

To be sure, not all of the Plaintiffs' first pre-Petition inventory will turn out to be frivolous. But the course of even the potentially non-frivolous cases demonstrates that no

centralized proceeding is needed. For instance, two of the cases filed shortly before this Panel's December Order decision were filed in the notoriously rapid docket of the Eastern District of Virginia. In the ensuing six months, those two cases (*Ali* and *Hagan-Brown*) have proceeded through case-specific fact and expert discovery promptly and efficiently, and Judge Trenga has set the cases for trial on August 24, 2015. The fact that these cases could be worked up for trial so quickly and efficiently reaffirms that a sprawling MDL proceeding is unnecessary to handle what are essentially simple cases dominated by case specific factors.

        **D.**      **Plaintiffs' Unsuccessful Efforts to Create a "Quasi-MDL"**

Shortly after the denial of the petition and with the prospect of actually having to litigate the cases they filed, Plaintiffs' counsel took the remarkable step of trying to create, in their own words, a "quasi-MDL." Frustrated that Lilly would not simply agree to toll all of their purported cases and discuss paying them money, Plaintiffs devised an unusual strategy: first, they filed a few anchor cases in the Southern District of Indiana, Lilly's home district. Then, in the 120-day period permitted under the Rules before they had to serve those cases, they filed a slew of motions pursuant to § 1404 to transfer the very cases this Panel had just ruled pursuant to § 1407 should not be centralized.

Every court to consider this request has rejected it. In a string of consistent rulings, the respective would-be transferor courts ruled that these cases more properly belonged in the plaintiffs' home districts where plaintiffs filed them in the first place.[3] Several courts

---

[3] See *Cheshier v. Eli Lilly and Co.*, No. 1:14-cv-01265-GEB-SKO (Dkt. 30) (E.D. Cal. Apr. 9, 2015) (denying motion to change venue); *Woodruff v. Eli Lilly and Co.*, No. 2:14-cv-01890-GEB-SKO (Dkt. 27) (E.D. Cal. Apr. 9, 2015) (same); *Wheeler v. Eli Lilly and Co.*, No.14 cv 1882 AJB (BLM), 2015 U.S. Dist. LEXIS 84085 (S.D. Cal. Apr. 10, 2015) (same); *Krupp v. Eli Lilly and Co.*, No: 8:14-cv-2792-T-35TGW, 2015 U.S. Dist. LEXIS 83762 (M.D. Fla. Apr. 6, 2015) (same); *Brotherton v. Eli Lilly and Co.*, No. 8:14-cv-02876-MSS-TGW (Dkt. 28) (M.D. Fla. Apr. 6, 2015) (same); *Laica-Bhoge v. Eli Lilly and Co.*, 2015 WL 3919515, at *1, 8 (M.D. (continued…)

specifically pointed out the inappropriateness of "us[ing] 1404 transfer as a pseudo-appellate vehicle for unhappy MDL petitioners." *See, e.g., Krupp*, 2015 U.S. Dist. LEXIS 83762, at *12(citation and internal quotation marks omitted) (noting that such misuses of § 1404 "raise[] significant comity concerns"); *accord Laica-Bhoge*, 2015 WL 3919515, at *1, 8 (M.D. Fla. June 25, 2015) (observing that the JPML had considered and rejected the same arguments now being advanced for § 1404 transfer); *Gollin*, 2015 U.S. Dist. Lexis 83764, at *5 (same).[4]

Undaunted, various Plaintiffs' counsel, including the counsel who has filed this second petition, have filed seven more multi-plaintiff lawsuits in the Southern District of Indiana, as well as three multi-plaintiff lawsuits in the Eastern District of California. Lilly has moved in these cases to sever all of the unrelated plaintiffs lumped into these complaints and to transfer the respective plaintiffs to their home districts. While Plaintiffs characterize Lilly's efforts to sever and transfer the cases in the Southern District of Indiana and the Eastern District of California as Lilly's failure to live up to its commitment to "cooperate," Plaintiffs' brand of "cooperation" — allowing the same warehousing of cases that this Panel's prior order prevented — was surely not what the Panel had in mind when it encouraged the parties to coordinate in

---

Fla. June 25, 2015) (same); *Valentino v. Eli Lilly and Co.*, 2015 U.S. Dist. Lexis 91254 (M.D. Fla. June 17, 2015) (recommending denial of motion to change venue), adopted by 2015 U.S. Dist. Lexis 91253 (M.D. Fla., July 14, 2015); *Gollin v. Eli Lilly and Co.*, 2015 U.S. Dist. Lexis 83764 (S.D. Fla. Mar. 31, 2015) (denying motion to change venue); *Couch v. Eli Lilly and Co.*, 2015 U.S. Dist. Lexis 84088 (N.D. Ga. Apr. 10, 2015) (same); *Ali v. Eli Lilly and Co.*, 2015 U.S. Dist. Lexis 85008 (E.D. Va. Mar. 4, 2015) (deferring motion until completion of discovery, while expressing doubt that transfer would serve the interests of justice); *Hagan-Brown v. Eli Lilly and Co.*, No. 1:14-cv-01614-AJT-JFA (Dkt. 27) (E.D. Va. Mar. 4, 2015) (same); *Ali v. Eli Lilly and Co.*, No. 1:14-cv-01615-AJT-JFA (Dkt. 112) (E.D. Va. June 18, 2015) (deeming motion withdrawn); *Hagan-Brown v. Eli Lilly and Co.*, No. 1:14-cv-01614-AJT-JFA (Dkt. 102) (E.D. Va. June 18, 2015) (same).

[4] Two Courts granted Plaintiffs' motions to dismiss their cases without prejudice. It is the counsel for those plaintiffs who, after re-filing cases involving those original plaintiffs (now named with many other plaintiffs in omnibus complaints) in the Southern District of Indiana, has filed the present petition.

discovery going forward. Indeed, the Panel's order made no suggestion that the parties should fashion their own MDL through other means.

E.     **Completion of Common Discovery**

As the original panel order noted, significant common discovery had occurred in the first year and a half of this litigation. In the past seven months, even more extensive common discovery has taken place. In an effort to informally coordinate the pending cases and avoid inefficient and needless duplication, such discovery has been made available to all Plaintiffs in cases in which discovery has been served on Lilly and protective orders have been entered. And such discovery will be made available to all future plaintiffs in the same manner.

Discovery to date in this litigation has been expansive, touching on every facet of the medicine's development (including the multi-year Cymbalta clinical trial program), labeling, marketing, and safety surveillance. It includes:

- 1,750,643 pages from Cymbalta's Investigational New Drug Application and New Drug Application submissions, including (among other items): correspondence between Lilly and FDA on Cymbalta's clinical trial data and labeling, regulatory submissions by Lilly to FDA related to Cymbalta, Cymbalta promotional materials, and safety reporting;

- 259,235 pages comprising standard operating procedures and policies governing Lilly's labeling, marketing, and safety practices;

- 897,012 pages comprising responsive e-mail files from 18 custodians, including current and former Lilly employees with roles in Cymbalta's development, labeling, marketing, and safety surveillance;

- Four 30(b)(6) depositions (consisting of 764 transcript pages) on multiple topics related to Lilly's regulatory affairs, sales training, clinical trial, and safety surveillance functions; and

- Seven fact depositions (consisting of 1,895 transcript pages) of current and former Lilly employees involved with the development, clinical trials, and post-marketing surveillance of Cymbalta.[5]

Thus, common discovery from Lilly is substantially, if not entirely, complete.

## II.  ARGUMENT

The Panel's initial decision correctly recognized that the different procedural postures of the cases, the development of a common discovery record and the small number of firms involved in the litigation weighed in favor of denying Plaintiffs' petition. Since the Panel's decision, there have been no significant changes in circumstances to justify a change in course.

The cases continue to be in different procedural postures with the first two trials occurring in the past ten days. And the common discovery record, which the Panel identified as substantial as of the time of its ruling, has only been expanded. Thus, it is even more true today than it was at the time of the Panel's initial decision that "common discovery has already taken place" and the case-specific issues will dominate this litigation: each individual plaintiff's use and discontinuation of Cymbalta and each physician's decision to prescribe and discontinue it. Finally, while a few new firms have filed cases, there are still relatively few firms involved on Plaintiffs' side and the litigation is being driven by an even smaller number of firms that were driving the litigation at the time of the initial petition as well.

In addition, centralization of this litigation would not further the goals of 28 U.S.C. § 1407. Given the case-specific focus, centralization would not serve the convenience of the parties and witnesses. Nor would it promote the just and efficient conduct of this litigation. Rather, centralization would have the opposite effect of delaying the ultimate resolution of these

---

[5] Lilly has cross-noticed all of the company depositions that have taken place in the Eastern District of Virginia actions in the pending actions in place at the time of the depositions and made provisions for any interested counsel to participate.

cases, which are already proceeding justly and efficiently, and allow Plaintiffs to warehouse "thousands" of cases that on their own merits would not warrant prosecution.

    A.    **The Panel Should Not Centralize These Actions.**

          1.    **The Principal Concerns Underlying the Panel's Earlier Denial of Centralization Apply with Equal Force Now.**

Under this Panel's decisions, the Panel will reconsider a prior denial of centralization only "where a significant change in circumstances has occurred." *In re Plavix Mktg., Sales Practices, and Prods. Liab. Litig.* ("*Plavix II*"), 923 F. Supp. 2d 1376, 1378 (J.P.M.L. 2013) ("[An] earlier denial also does not preclude us from reaching a different result here. We will do so only rarely, however, where a significant change in circumstances has occurred."). Here, no such significant change in circumstances has occurred. In fact, recent developments render centralization even less appropriate now than it would have been eight months ago.

As the Panel noted in its earlier decision, significant common discovery had occurred by December 2014. Since then, at Plaintiffs' urging, Lilly has produced over one million additional pages of discovery and made five additional corporate witnesses available for depositions. These cooperative discovery efforts by Lilly — combined with the parties' written discovery and expert discovery in five separate cases — have resulted in a robust, complete collection of company-side discovery materials that Lilly has made available to all Plaintiffs' counsel in matters where discovery has been served on Lilly and protective orders are in place. Lilly will of course continue to make this common discovery available moving forward. At this point in the litigation, further common discovery would be both unnecessary and inappropriate, and thus no centralized proceeding is necessary to oversee any remaining discovery. And even if

11

further discovery occurs in a particular jurisdiction, it is likely to be limited in scope and will be made available to all Plaintiffs' counsel.[6]

Plaintiffs argue that no discovery has occurred on various issues — principally marketing-related issues, post-marketing surveillance, and the design of the Cymbalta capsule. Plaintiffs' allegation suggests they have not even bothered to review the extensive materials Lilly has already provided, which include extensive post-marketing surveillance reports and data, all of Lilly's promotional material in the United States and associated marketing plans, and detailed information in the NDA regarding Cymbalta's design and formulation.[7] Moreover, Plaintiffs took Rule 30(b)(6) depositions on post-marketing surveillance and sales training, and have questioned numerous individual company witnesses about marketing-related issues and post-marketing surveillance.

The particular Plaintiffs' counsel who filed the instant motion complains that his clients have not received any of Lilly's discovery and had no hand in generating it. Plaintiffs' counsel himself, however, proposed a stay of discovery in his actions and has actually *never* served discovery requests on Lilly. March 4, 2015 e-mail from P. Jones to S. Stein (attached as Exhibit 2). And counsel's suggestion that he has a right to re-depose company witnesses and

---

[6] Plaintiffs raise sanctions motions that have been filed in the Central District of California and the Eastern District of Virginia, but such motions have no bearing on the issues before this Panel. The motions in California are still pending and those cases have already proceeded to trial (or in the case of *Saavedra*, class certification has twice been denied). The sanctions motion in the Eastern District of Virginia related to a public police report Lilly obtained in which an individual plaintiff had her husband arrested for domestic violence that the Court ruled Lilly should have turned over more quickly after it obtained it from the court file -- it had absolutely no relation to the centralization factors under §1407 and is simply an attempt to smear Lilly.

[7] It is notable that Plaintiffs' discovery concerning the design of the Cymbalta capsule relates to Plaintiffs' design defect claims, which Plaintiffs have withdrawn or agreed to withdraw in almost all of the pending cases when faced with Lilly's preemption motions.

engage in other duplicative discovery, of course, undermines rather than supports one of the principal goals of centralization — that is, eliminating duplicative discovery.

In short, all of the discovery that remains to be conducted in the pending cases is case-specific. These efforts will consist almost exclusively of collection of medical records, depositions of Plaintiffs, their prescribers, and related witnesses — nearly all of whom reside in or near Plaintiffs' home districts. Accordingly, there would be little, if any, benefit to centralization. Indeed, in light of the completion of common discovery, these cases are now at the stage at which transfer back to their original districts would be appropriate if centralization had previously been ordered.

Plaintiffs' assertion that the pending cases "are all on the same discovery schedule" is similarly inaccurate. As an initial matter, the discovery schedules in the pending cases with scheduling orders contain close of fact discovery deadlines ranging between December 2015 and August 2016. Many of the newer filed cases have no such schedule. More importantly, in making this argument, Plaintiffs summarily dismiss the relevance of the cases that have been completed or have been set for trial. The fact that four Cymbalta cases have been deemed trial-ready (and that two trials have been completed) speaks to the central question for the Panel's inquiry. By litigating the cases through trial, the Courts have addressed many of the issues that transferee courts typically address in an MDL context, including, but not limited to, deposition designations of company witnesses, *Daubert* motions related to causation and other issues, motions *in limine*, and other evidentiary issues. *See In re Zoloft (Sertraline Hydrochloride) Products Liability Litigation*, 856 F. Supp. 2d 1347, 1348 (J.P.M.L. 2012) (centralizing litigation and emphasizing that coordination would offer efficiencies for common discovery issues, but also for expert discovery and *Daubert* motions). The same or similar issues

will be raised in nearly every case moving forward and while the various courts involved in the litigation will not be bound by these initial rulings, the same is true in the context of an MDL following remand to the transferor districts. Moreover, the trials themselves will provide useful guidance for other courts in the overall litigation. In fact, Judge Wilson's rulings on Lilly's *Daubert* motions and motions *in limine* in the Central District of California trials, in which the Court severely limited the testimony of Plaintiffs' experts and declared much of Plaintiffs' proposed evidence irrelevant or prejudicial, demonstrate that Plaintiffs expansive discovery efforts into every aspect of Cymbalta have been unnecessary. *See Herrera v. Eli Lilly and Co.*, No. 2:13-cv-02702, ECF Nos. 346 (Order on *Daubert* Motions), 347 (Order on Motions in Limine); *Hexum v. Eli Lilly and Co.*, No. 2:13-cv-02701, ECF Nos. 343, 344. (attached as Exhibit 3).

Plaintiffs' argument that additional law firms have joined the litigation does not support centralization. Of the 43 cases listed in the Schedule of Actions, Baum Hedlund Aristei Goldman PC appears as counsel on behalf of Plaintiffs in 32 cases. Of the 13 remaining cases, Keller Rohrback LLP appears as counsel in 8 cases. And Baum Hedlund and Keller Rohrback have already demonstrated their ability to coordinate with each other and Lilly on discovery and pretrial issues, and indeed have been closely coordinating on all of the cases in active discovery. Moreover, at depositions of company witnesses in the Eastern District of Virginia actions, counsel from Baum Hedlund and Keller Rohrback appeared together and alternated as lead counsel at certain depositions. Thus, there are only 5 cases in which Baum Hedlund or Keller Rohrback is *not* listed as counsel of record. Coordination between counsel is entirely feasible in those actions. And, of course, as the Court noted in its initial decision denying centralization, it

14

remains true that "Lilly is represented in all actions by a single law firm."  65 F. Supp. 3d at 1394.

Plaintiffs point to *In Re: Lipitor (Atorvastatin Calcium) Marketing, Salespractices & Prods. Liab. Litig.* (*Lipitor II*), 997 F. Supp. 2d 1354 (J.P.M.L. 2014) to support their position that the Panel should reconsider its initial decision, but the circumstances in *Lipitor II* were significantly different than those presented here.  In *Lipitor II*, actions were pending before more than 100 different federal judges, the number of unique plaintiffs' counsel in the cases made it "highly difficult, if not impossible" for coordination, there were related Lipitor suits pending in at least three state courts, and there was no suggestion by the Panel that common discovery was close to complete or that bellwether trials had occurred.  *Id.* at 1356.  Here, the cases are pending before far fewer than 100 different judges, Baum Hedlund's and Keller Rohrback's roles in the litigation make coordination easy, there is related Cymbalta litigation in only two state courts (California and Kentucky), and, of course, common discovery is complete.

In sum, developments since this Panel's prior denial of centralization have resulted in the development of an even more robust and complete common discovery record.  Current and future discovery efforts therefore will necessarily focus on case-specific issues, principally depositions of Plaintiffs and their prescribers.  Centralization would not facilitate more efficient management of these efforts, which will involve case-specific inquiries in various locales across the country.  These workstreams can be better managed by the local district courts in the relevant jurisdictions — as opposed to asking a single court to oversee a morass of disparate, geographically-dispersed case-specific discovery efforts.

For this reason, there has been no change in circumstances that would warrant a reversal of the Panel's earlier decision. Indeed, recent developments only affirm the wisdom of the Panel's December 2014 ruling.

### 2. Centralization of This Litigation Would Not Further the Goals 28 U.S.C. § 1407.

Pursuant to 28 U.S.C. § 1407, centralization is appropriate where: (1) the cases involve "one or more common questions of fact"; (2) centralization would be "for the convenience of parties and witnesses"; and (3) transfer would "promote the just and efficient conduct of" the litigation. 28 U.S.C. § 1407(a).

Here, centralization would satisfy none of these criteria.

While it is true, as the Panel noted in its December 2014 decision, that these lawsuits share some factual similarities, it is equally true that all of those similarities relate to Cymbalta's development, approval, and labeling. Beyond this, the cases diverge considerably, with their outcomes ultimately turning on case-specific facts involving individual Plaintiffs and individual prescribers. Because discovery pertaining to common issues is complete, transfer at this juncture would not facilitate the litigation of any "common questions of fact."

Nor would centralization be "for the convenience of parties and witnesses." Irrespective of whether centralization is ordered, future discovery efforts will necessarily focus on individual Plaintiffs and prescribers across the country. Centralization would therefore do little to minimize travel and other expenses.

As for whether centralization would "promote the just and efficient conduct of" this litigation, Plaintiffs' counsel's own words — in which counsel candidly concedes that he plans to conduct duplicative discovery, including re-depositions of company witnesses — show this not to be the case. In fact, the true reason behind Plaintiffs' desire to centralize is anything

but just or efficient: having recognized that their claims are unlikely to withstand meaningful merits review, Plaintiffs seek to warehouse their lawsuits before a single court — in which they would bury meritless claims beneath a shield of manufactured, duplicative discovery efforts. This would not be just, nor is it what the multidistrict litigation statute was designed to achieve. *See In re Lipitor (Atorvastatin Calcium) Mktg., Salespractices & Prods. Liab. Litig.* (*Lipitor I*), 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013) (the Panel is "disinclined to take into account the mere possibility of future filings in our centralization calculus"); *see also In re CVS Caremark Corp. Wage and Hour Emp't Practices Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) ("[W]here a Section 1407 motion appears intended to further the interests of particular counsel more than those of the statute, we would certainly find less favor with it."). Accordingly, Plaintiffs' second motion for centralization should be denied.

### B. If the Panel Determines That An MDL Is Warranted, Lilly Would Propose Transfer to the Southern District of Indiana, the District of Columbia, or the Middle District of Florida.

Should the Panel disagree with Lilly and conclude that centralization is warranted, Lilly would not oppose centralization in the Southern District of Indiana. Lilly also would be amenable to centralization in the District of Columbia (the site of Lilly's counsel and many experienced MDL judges, although there are no cases currently pending there), or the Middle District of Florida (where Judge Moody, who recently terminated the consolidated Accutane proceeding, would be exceptionally well-suited to maintain experienced control over any necessary centralized proceeding).

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' second motion for centralization should be denied in its entirety. In the alternative, the Panel should centralize the subject actions in either the Southern District of Indiana, the Middle District of Florida, or the District of Columbia.

17

Respectfully submitted,

/s/ Michael X. Imbroscio
Michael X. Imbroscio
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, DC 20004
Tel: (202) 662-6000
Fax: (202) 778-6000
mimbroscio@cov.com

*Counsel for Defendant Eli Lilly and Company*